THE METROPOLITAN LIFE-INSURANCE COMPANY V.
LIZZIE ELISON.

No. 14,264.    (83 Pac. 410.)

SYLLABUS BY THE COURT.

1. LIFE-INSURANCE—*Insurable Interest.*  An uncle of one whose life is insured has no insurable interest in the life of the insured by reason of kinship.

2. ——— *Public Policy—No Insurable Interest.*  It is against public policy and contrary to law to permit any one to obtain insurance upon the life of a human being, by assignment or otherwise, where such person has no insurable interest in the life of the insured.

3. ——— *Assignment of Policy Held to Invalidate It.*  An agreement by which one-half of the insurance provided for in a life-insurance policy was assigned and transferred by the insured and the beneficiary to one having no insurable interest in the life of the insured, upon consideration that the assignee was to pay the premiums as they accrued, contravenes public policy, and neither the assignee nor the beneficiary who participated in the tainted transaction can recover upon the policy.

4. ——— *Case Followed.*  The case of *Life Ins. Co. v. Mc-Crum,* 36 Kan. 146, 12 Pac. 517, 59 Am. Rep. 537, approved and followed.

Error from Lyon district court; DENNIS MADDEN, judge.  Opinion filed November 11, 1905.  Reversed.

STATEMENT.

ACTION on an insurance policy issued on the life of Adolph Elison for $2000, running twenty years, with quarterly premiums of $13.96, his wife, Lizzie Elison,

being named as beneficiary. She brought this action, alleging the issuance of the policy on July 18, 1900, the death of her husband on December 1, 1900, and setting up a contract between herself and husband on the one part, and his uncle, Casper Elison, on the other, by which an interest in the policy to the extent of $1000 was assigned to Casper Elison in consideration that he should pay the premiums upon the policy. The following is a copy of the contract:

"THIS CONTRACT, Made and entered into this 30th day of July, 1900, by and between Adolph Elison and Lizzie Elison, his wife, of Emporia, Kan., parties of the first part, and Casper Elison, of Emporia, Kan., party of the second part, WITNESSETH: That whereas, the said Adolph Elison has taken out a policy of insurance in the Metropolitan Life-insurance Company, of the city and the state of New York, which is numbered 186,718, for $2000, on the life of the undersigned Adolph Elison, dated July 18, A. D. 1900, through J. J. Butler, its authorized and duly acting agent, at Topeka, Kan., at the yearly premium of $55.84, and quarterly $13.96.

"Now, it is mutually understood by and between the parties hereto, to wit, said Adolph Elison, assured, and Lizzie Elison, his wife and beneficiary, and the said Casper Elison, that if the said Casper Elison shall promptly pay at the proper time said quarterly instalment premiums, to wit, $13.96 each, or $55.84 per year, when the same are due, as required by the terms of said policy, for the term of twenty years, or during the life of the said Adolph Elison, the assured, then at the end of twenty years, or at the death of the assured, the said Lizzie Elison shall pay to said Casper Elison the sum of $1000; and the said Adolph Elison hereby agrees to this proposition, and instructs his said wife and authorizes her to pay to said Casper Elison the sum of $1000 as aforesaid, and the said Adolph Elison and his wife, Lizzie Elison, constitute said Casper Elison their agent to pay said premiums out of his money for that purpose and to transact all business for them in their behalf in this matter, for the reason that they are Germans and cannot speak and write the English language fluently, hereby authorizing said Elison to keep the policy above referred to in his own possession for reference and to acquaint him-

self with its terms of payment of premiums, and that upon the death of said Adolph Elison the said Adolph Elison now in his lifetime constitutes and appoints said Casper Elison his attorney and in his name and stead, and said Lizzie Elison, his wife, also joins in this appointment of said Casper Elison, to transact all the matters of business for them, as they are not acquainted with the forms and methods of business in this country, agreeing and understanding that, in the consideration of the payment of said premiums regularly as before mentioned, said Casper Elison shall receive at the end of twenty years from the date thereof, or upon the death of assured, Adolph Elison, the said sum of $1000.

"And upon his part the said Casper Elison hereby agrees to promptly pay at the proper time and times all these premiums as they fall due as aforesaid, and, to further secure the said Casper Elison for the sum of money so paid out and invested for them, the said Adolph Elison and Lizzie Elison, the said Lizzie Elison agrees to turn over to said Casper Elison, at the death of said Adolph Elison, or at the end of twenty years, or when the said policy shall be paid, the draft indorsed by her, that the said Elison may reimburse himself for the moneys so invested to the amount of $1000, as aforesaid.

"IN WITNESS WHEREOF, The said parties to this contract have hereunto signed their names and executed this contract for all the purposes therein named, the day and year first above written.

(Signed)    CASPER  ELISON.<br>
ADOLPH  ELISON.<br>
LIZZIE  ELISON."

"STATE OF KANSAS, LYON COUNTY, SS.·

"Be it remembered, that on this, the 30th day of July, 1900, before me, the undersigned, a notary public, personally appeared Adolph Elison, Lizzie Elison, his wife, said first parties, and Casper Elison, said second party, who each signed the above contract as their own voluntary act, and acknowledged the execution of the same.

"IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my notarial seal, the day and date last above written.

[SEAL.]    (Signed)    CHARLES FLETCHER,
Commission expires November 18, 1902.    *Notary Public.*"

Casper Elison having died, his legal representative, Lena Elison, was made a defendant, and in a cross-petition she alleged that Casper Elison had paid two premiums ($27.92) on the policy, and claimed a recovery of $1000 of the insurance by virtue of the contract of assignment. The insurance company separately demurred to the petition of Lizzie Elison, and to the cross-petition of Lena Elison, on the ground that neither stated a cause of action against the company. The trial court overruled the demurrer to the petition, but sustained it as to the cross-petition. Afterward the insurance company filed an answer, alleging that, notwithstanding the answers of Adolph Elison that he was in good health and had never been sick and had no usual medical attendant, he was then in fact ill with tuberculosis and had been treated for that disease by physicians. The reply denied the averments of the answer, and alleged that the insurance company accepted the risk with knowledge of Adolph Elison's physical condition. The trial resulted in favor of Lizzie Elison, and the insurance company complains.

*James H. Austin,* for plaintiff in error.

*S. F. Wicker,* and *Fuller & Jackson,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, C. J.: The controlling question in the case is, Can the beneficiary, Lizzie Elison, who joined in the contract by which the insurance on her husband's life was assigned to Casper Elison, recover on the policy? In her petition, and in part as a basis of recovery, she set up the contract, which appears to have been entered into with Casper Elison twelve days after the policy was issued. The demurrer to the petition raised the question whether, under the facts stated, as well as those admitted by the recitals of the contract, she had stated a cause of action. The contract is plain in its provisions and leaves no doubt

about the purposes of the parties. Casper Elison agreed to pay the premiums on the policy for twenty years, or until the death of Adolph Elison, and in consideration therefor was to receive $1000 of the insurance money to be paid by the company. There was some claim that he was only to be reimbursed to the extent of the payments made, but it is expressly stated, and again repeated, that he was to receive $1000 at the death of the insured, or at the maturity of the policy. He was to have the possession of the policy, and the precaution was taken to provide that the draft drawn by the insurance company in favor of Lizzie Elison should be indorsed and turned over to the assignee.

Casper Elison was an uncle of the insured, and therefore had no insurable interest in his life by reason of kinship. (*Singleton v. St. Louis Mutual Insurance Company*, 66 Mo. 63, 27 Am. Rep. 321; *Prudential Insurance Company of America v. Jenkins*, 15 Ind. App. 297, 43 N. E. 1056, 57 Am. St. Rep. 228; *Appeal of Corson, Ex'r*, 113 Pa. St. 438, 6 Atl. 213, 57 Am. Rep. 417; 2 Joyce, Ins. § 1069.) The consideration of the transfer was not advances made by the uncle, nor was the transfer made as security for any subsisting indebtedness. It therefore appears that Lizzie Elison, the beneficiary of the policy, undertook to assign and transfer an interest in the policy to one who had no interest in the life of the insured.

The theory of life-insurance is that one who is interested in the preservation of the life of the insured may safely take and hold insurance, but that insurance in favor of one who has no interest in the life of the insured—who would be interested in his early death—is contrary to good morals and a sound public policy. In the early case of *Life Ins. Co. v. Sturges*, 18 Kan. 93, 26 Am. Rep. 761, it was held that such insurance, if sustained, would open the door to speculation and traffic in human life and invite to enter the most shocking of all crimes, and that "of all wagering

contracts, those concerning the lives of human beings should receive the strongest, the most emphatic, and the most persistent condemnation." The authorities generally unite in holding that one who has no insurable interest can no more take an interest in a policy, valid in its inception, by purchase and assignment than he could by direct issue from the insurer. In *Warnock v. Davis*, 104 U. S. 775, 26 L. Ed. 924, it was said:

"The assignment of a policy to a party not having an insurable interest is as objectionable as the taking out of a policy in his name. . . . If there be any sound reason for holding a policy invalid when taken out by a party who has no interest in the life of the assured, it is difficult to see why that reason is not as cogent and operative against a party taking an assignment of a policy upon the life of a person in which he has no interest."

It has been said:

"The evil of wager policies would rather be aggravated than otherwise by such a rule, because speculators, desiring to indulge in this species of gambling in human life, could more easily purchase from embarrassed policy-holders than procure the issue of such policies directly to themselves upon the lives of strangers. 'In either case,' as observed by a recent author in treating of this subject, 'the holder. of such policy is interested in the death, rather than the life, of the insured.' " (*Helmetag's Adm'r v. Miller*, 76 Ala. 183, 188, 52 Am. Rep. 316.)

As tending to sustain the view that a person cannot take directly, or by assignment, a policy of insurance on the life of one in whose life he has no insurable interest, see *Cammack v. Lewis*, 82 U. S. 643, 21 L. Ed. 244; *Gilbert v. Moose*, 104 Pa. St. 74, 49 Am. Rep. 570; *Carpenter, Appellant, v. U. S. Life Ins. Co.*, 161 Pa. St. 9, 28 Atl. 943, 23 L. R. A. 571, 41 Am. St. Rep. 880; *Ala. Gold Life Ins. Co. v. Mobile Mutual Ins. Co.*, 81 Ala. 329, 1 South. 561; *Whitmore v. Sup. Lodge Knights & Ladies of Honor*, 100 Mo. 36, 13 S. W. 495; *Heusner v. The Mut. Life Ins. Co.*, 47 Mo. App. 336;

*Thornberg v. Ætna Life Ins. Co.,* 30 Ind. App. 682, 66 N. E. 922; *Bayse v. Adams, &c.,* 81 Ky. 368; *Roller v. Moore's Adm'r,* 86 Va. 512, 10 S. E. 241, 6 L. R. A. 136; *Wilton v. New York Life Insurance Co.,* 78 S. W. (Tex. Civ. App.) 403.

In this case the interest of Casper Elison, who contracted with the beneficiary to pay all the premiums, would have been best subserved by the early death of Adolph Elison; and, in fact, death did occur in less than five months. It was a matter of much concern to him whether he should get the contingent amount of $1000 for a few premiums, or whether he should be required to pay them during the period of twenty years. In this respect it was more mischievous and vicious in its tendencies than many of such arrangements, because, if the insured had lived until the maturity of the policy, the assignee would have been required to pay even more than he was to receive. In that event he would have paid $1116.80, saying nothing of interest, for the $1000 of insurance money which he would receive; and, while there would have been a profit in the early death of the insured, his living until the end of the twenty-year period would have occasioned the assignee a substantial loss. Contracts of this character have been frequently denounced and held bad because they were regarded as wagers, but this court has declared them to be void on the broader ground that they are contrary to public policy.

If the transaction is tainted as to the assignee, who has no insurable interest, how does it stand as to the beneficiary in the contract of insurance, who participated in the wrong? If the agreement which furnished an inducement to take human life and a temptation to commit the most atrocious of crimes was participated in by the beneficiary voluntarily, how can she escape the condemnation of the law? She not only signed the agreement, but it appears that she was to take an active part in carrying it out, and was to re-

ceive a share of the insurance to be secured through the payment of premiums by Casper Elison.

We have given much attention to the relation which Lizzie Elison bore to the transaction, and if we follow the rule of *Life Ins. Co. v. McCrum,* 36 Kan. 146, 12 Pac. 517, 59 Am. Rep. 537, it must be held that the whole transaction was so tainted with illegality as to bar a recovery by her. There appears to be no substantial distinction between this case and the one cited. There the insurance company issued a paid-up policy to Snyder, payable to his two daughters. He and the beneficiaries, for a valuable consideration, joined in an assignment of the policy to Mrs. Parker, who had no insurable interest in Snyder's life. After the death of Snyder, Mrs. Parker, on learning that she could not collect the insurance, transferred the policy back to the beneficiaries, who in turn transferred it to McCrum, and he brought an action to recover upon the policy. It was held that McCrum stood in the shoes of the beneficiaries; that the transaction between the beneficiaries and the assignee was contrary to public policy, not to be tolerated by law; and that the policy was worthless and void, not only as to the assignee but also in the hands of the beneficiaries. In speaking of the participation of the beneficiaries in the tainted transaction it was remarked:

"This policy was placed in her [Mrs. Parker's] possession, not only with the written consent of the beneficiaries, but upon a valuable consideration paid to them for the same; they therefore aided in creating, in the mind of Mrs. Parker, a desire for the early death of the insured; they held out to her the temptation to bring about the event insured against. . . . In making the transfer and assignment, and in receiving the money therefor, the beneficiaries, Elizabeth and Desylvia Snyder, were participants with Mrs. Parker in the attempted fraud upon the insurance company; the whole transaction between the beneficiaries and Mrs. Parker contravenes public policy, and the law leaves the parties as it found them." (Page 149.)

Attention is called to the fact that in the McCrum case the beneficiaries received a consideration, while nothing was paid by the assignee to the beneficiary in the present case. Here Lizzie Elison procured Casper Elison to pay the premiums upon the policy in order to keep it alive, that she might receive a share of the insurance money. The fact that the assignee did not pay her money directly for the transfer did not take the vice out of the transaction nor make it less hurtful in its tendencies. It none the less, as was said in the McCrum case, aided in creating in the mind of the assignee a desire for the early death of the insured, and held out to him the temptation to bring about the event against which the insurance was issued. In the McCrum case the court further remarked:

"If the party who attempts to speculate in human life cannot enforce the policy which he has purchased on the life of another, in whose life he has no insurable interest, the beneficiaries who knowingly and purposely sell and assign to such a person the policy on the life of another for a valuable consideration ought not thereafter to be permitted to enforce the same for their own benefit. . . . It is not for the sake of the insurance company that the transactions between the beneficiaries and Mrs. Parker are held wrongful, but such rule is founded on general principles of public policy forbidding speculative contracts upon human life. In all such cases the courts ought not to lend their aid to assist parties engaged in the perpetration or attempted perpetration of such wrongful speculations." (Pages 150, 151.)

The case of *Powell v. Dewey*, 123 N. C. 103, 31 S. E. 381, 68 Am. St. Rep. 818, sustains the view taken in the McCrum case. There Powell took out a policy of insurance on his own life and assigned the same to the beneficiary named in the policy, who had no insurable interest. The assignee paid the premiums which accrued up to the death of the insured. Upon proof of death the insurance company paid the amount of the policy to the assignee, and the executor of Powell's estate then brought an action on behalf of the estate

against the assignee and the insurance company to recover the insurance money. The court held that the policy was void because of the transfer to one having no insurable interest; that no action could be maintained upon it by the beneficiary against the insurance company, nor could the plaintiff, who was the representative of the insured, maintain an action, because, "looking at it in any view, it has its foundation on the policy, which is void." (See, also, *Hinton v. Insurance Co.*, 135 N. C. 314, 47 S. E. 474, 65 L. R. A. 161, 102 Am. St. Rep. 545.)

The McCrum case is deemed to be a controlling authority in the present one, and the court is not inclined to overrule or modify that decision. It follows that the judgment must be reversed and the cause remanded, with directions to sustain the demurrer of the insurance company to the petition of Lizzie Elison.

All the Justices concurring.